UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

HERBERT LEE PRINGLE,        )    Civil Action No.: 4:21-cv-02635-TER
            Plaintiff,    )
                      )
       -vs-        )
                      )    **ORDER**
Kilolo Kijakazi,         )
Acting Commissioner of Social Security,  )
                      )
         Defendant.    )
_____)

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social Security, denying Plaintiff's claim for disability insurance benefits (DIB). The only issues before the Court are whether the findings of fact are supported by substantial evidence and whether proper legal standards have been applied. This action is proceeding before the undersigned pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. Proc. R. 73.

## I. RELEVANT BACKGROUND

### A.    Procedural History

Plaintiff filed an application for DIB on July 29, 2013, alleging inability to work since July 14, 2012. (Tr. 796). His claims were denied initially and upon reconsideration. Thereafter, Plaintiff filed a request for a hearing. A hearing was held in July 2015, at which time Plaintiff testified. (Tr. 796). The Administrative Law Judge (ALJ) issued an unfavorable decision on October 6, 2015, finding that Plaintiff was not disabled within the meaning of the Act. (Tr. 12-18). Plaintiff filed a request for review of the ALJ's decision. The Appeals Council denied the request for review in November 2016. (Tr.1-3). Plaintiff filed an action in this court and this court remanded in August

2017. (Tr. 934). Another hearing was held in May 2018. (Tr. 796). In October 2018, the ALJ again found Plaintiff not disabled. (Tr. 796). The Appeals Council assumed jurisdiction and again the case was remanded. (Tr. 796). A third hearing was held in February 2020. On March 5, 2020, the ALJ found Plaintiff not disabled through the date last insured of December 31, 2015. (Tr. 814). The Appeals Council found no reasons to assume jurisdiction in June 2021. (Tr. 787). Plaintiff filed another action in this court in August 2021. (ECF No. 1).

**B.     Introductory Facts**

Plaintiff was fifty-one years old on the date last insured. (Tr. 812).  Plaintiff has at least a high school education and past relevant work as an electrician. (Tr. 812). Plaintiff alleges disability initially due to lung, heart, and feet problems, sarcoidosis, cardiac sarcoidosis, residual effects from frostbite, high blood pressure, and high cholesterol.  (Tr. 61).

**C.     The ALJ's Decision**

In the decision of March 5, 2020, the ALJ made the following findings of fact and conclusions of law (Tr. 796):

1.    Claimant last met the insured status requirements of the Social Security Act on December 31, 2015.

2.    Claimant did not engage in substantial gainful activity during the period from his alleged onset date of July 14, 2012 through his date last insured of December 31, 2015 (20 CFR 404.1571 *et seq*.).

3.    Through the date last insured, claimant had the following severe impairments: sarcoidosis and lower extremity neuropathy (20 CFR 404.1520(c)).

4.    Through the date last insured, claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

2

5.      After careful consideration of the entire record, I find that, through the date last insured, claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with some non-exertional limitations. Specifically, claimant could lift and carry up to 20 pounds occasionally and 10 pounds frequently. He could stand, walk, and sit for 6 hours each in an 8-hour day. He could never climb ladders or scaffolds. He could climb ramps and stairs only occasionally. Claimant could have no exposure to temperature extremes, high humidity, concentrated pulmonary irritants, or work hazards.

6.      Through the date last insured, claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.      Claimant was born on December 28, 1964 and was 51 years old, which is defined as a younger individual age 18-49, on the date last insured. Claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8.      Claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that claimant is "not disabled," whether or not claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Through the date last insured, considering claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.     Claimant was not under a disability, as defined in the Social Security Act, at any time from July 14, 2012, the alleged onset date, through December 31, 2015, the date last insured (20 CFR 404.1520(g)).

## II. DISCUSSION

Plaintiff argues the ALJ did not properly evaluate cane use in the RFC and did not properly account for sarcoidosis. Plaintiff argues the ALJ failed to perform a proper function by function analysis. Plaintiff argues the ALJ erred in weighing the VA's disability rating opinion. Plaintiff

argues the ALJ erred in the subjective symptom evaluation. Defendant argues the ALJ's analysis here was sufficient, was in accordance with the applicable law, and Plaintiff has failed to show that the ALJ's decision is not based on substantial evidence.

## A.     LEGAL FRAMEWORK

### 1.     The Commissioner's Determination–of–Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as: the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months. 42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting the "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5)

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the

whether the impairment prevents him from doing SGA. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. See 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform

---

claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

other work. *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [ ] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases *de novo* or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir.1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Substantial evidence as a threshold is "not high;" "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to

support the agency's factual determinations."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

**B.     ANALYSIS**

**<u>RFC</u>**

An adjudicator is solely responsible for assessing a claimant's RFC.  20 C.F.R. § 416.946(c).

In making that assessment, he must consider the functional limitations resulting from the claimant's

medically determinable impairments.  Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, at

*2.  This ruling provides that: "The RFC assessment must include a narrative discussion describing

how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings)

and nonmedical evidence (e.g., daily activities, observations)."  SSR 96–8, *7.  "The adjudicator

must also explain how any material inconsistencies or ambiguities in the evidence in the case record

were considered and resolved."  *Id.*    Additionally, " 'a necessary predicate to engaging in a

substantial evidence review is a record of the basis for the ALJ's ruling,' including 'a discussion of

which evidence the ALJ found credible and why, and specific application of the pertinent legal

requirements to the record evidence.' "  *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)

(*quoting Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013)).  The ALJ considers the evidence in

the record as a whole when analyzing Plaintiff's claims, as does this court when reviewing the ALJ's

decision.  *See Craig*, 76 F.3d at 595.

**<u>Cane</u>**

Plaintiff argues the ALJ did not properly evaluate cane use in the RFC.

SSR 96-9p is titled "Implications of an [RFC] for less than a Full Range of Sedentary Work."

"The following sections provide adjudicative guidance as to the impact of various RFC limitations

and restrictions on the unskilled sedentary occupational base."  SSR 96-9p, 1996 WL 374185, *5.

7

While SSR 96-9p mainly relates to RFC concerns of a less than full range of sedentary work, in the past, this court and Defendant have cited SSR 96-9p, in relation to plaintiffs with RFCs greater than sedentary. In such circumstance, SSR 96-9p was treated as guidance as to cane use consideration in making an RFC determination and not as a requirement or mandatory. *See Pryor v. Comm'r*, No. 4:17-2827-DCN-TER, *aff'd by,* 818 Fed. Appx. 258 (4th Cir. Aug. 26, 2020). Thus, the court continues to treat SSR 96-9p as additional guidance and not a requirement where a plaintiff's RFC is greater than sedentary. SSR 96-9 provides:

> To find that a hand-held assistive device is <u>medically required</u>, there <u>must be medical documentation establishing the need</u> for a hand-held assistive device to aid in walking or standing, <u>and describing the circumstances for which it is needed</u> (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96-9p, 1996 WL 374185 at *7 (emphasis added).

As to cane use, the ALJ here noted when making the impairment finding at earlier steps:

> In January 2012, claimant requested that the VA issue him a cane with a flat handle, stating his current cane hurt his hand. VA treatment notes indicate claimant's primary care provider was to issue a new cane. (Exhibit B1F/253, 254) Claimant was observed by providers on some occasions to be using a cane. Claimant told his pulmonologist in March 2014 that he had been walking with a cane for 4 to 5 years because of a prior frostbite injury. (Exhibit B5F/20) **Treatment records, however, do not support the medical necessity of a cane.** The abnormal findings documented by claimant's podiatrist were not so significant as to support the use of a cane, and claimant's podiatrist **did not note that the use of a cane was medically necessary**. (Exhibits B1F and B9F)

> While treatment records document some findings of an abnormal gait, they do not routinely document such findings, and claimant's podiatrist observed claimant to have a normal gait in November 2012. (Exhibit B1F/193-195) Claimant's cardiologist reported in July 2013 that claimant did not have a cane with him and that

claimant was walking 30 minutes per day. (Exhibit B1F/3) Claimant's pulmonologist observed him to be walking with a cane in November 2015, and claimant stated he used the cane because of his history of frostbite. (Exhibit B15F/125, 127) Nevertheless, during a December 2015 appointment with a neurologist, claimant had a steady, normal based gait and was noted to be able to toe, heel, and tandem walk. The neurologist did not report observing claimant to be using a cane. (Exhibit B15F/137) **Accordingly, I do not find that the use of a cane was medically necessary.**

(Tr. 800)(emphasis added). Later in the RFC explanation, the ALJ referred to this discussion and considered both abnormal and normal findings but that overall the evidence did not support medical necessity of a cane:

> As discussed in paragraph 3 of this decision, records document <u>some findings of an abnormal gait, but they do not routinely document such findings</u>. Likewise, while claimant reported he uses a cane secondary to his remote history of frostbite injuries to the feet, he was not consistently observed by his providers to be using a cane. Notably, the neurologist who examined claimant in December 2015 did not report observing claimant to be using a cane, but reported claimant to have a steady, normal based gait and to be able to toe, heel, and tandem walk. (Exhibit B15F/137) The overall evidence does not support a conclusion that the use of a cane was medically necessary. <u>Therefore, I have not included the use of a cane in claimant's assigned residual functional capacity</u>.

 (Tr. 808)(emphasis added).

The ALJ is not required to account for an assistive device if Plaintiff has not demonstrated that the device is medically required. *Sanford v. Saul*, No. 5:18-cv-2886- KDW, 2020 WL 633743, at *9–11 (D.S.C. Feb. 11, 2020). The ALJ discussed both findings of cane use and the absence of cane use/normal gait findings from the record. As the ALJ noted, cane use is not the inquiry but medical necessity and the description of circumstances for need is the standard. Defendant notes that Plaintiff references the same evidence the ALJ considered and identified no documentation establishing a medical need and describing the circumstances for which it is needed. (ECF No. 25 at 17-18; ECF No. 27 at 9).  It appears there was no cane prescription in the record. Even where a

cane is prescribed, it does not necessarily follow that it is medically required as defined in the regulations. *Joines v. Colvin*, No. 3:14–cv–00396–MOC, 2015 WL 1249579, at *6 (W.D.N.C. Mar. 18, 2015); *see also Wimbush v. Astrue*, No. 4:10–CV–00036, 2011 WL 1743153, at *3 (W.D. Va. May 6, 2011); *Eason v. Astrue*, No. 2:07–CV–00030–FL, 2008 WL 4108084, at *16 (E.D.N.C. Aug. 29, 2008)). The ALJ simply discredited Plaintiff's evidence after carefully considering it in light of contradictory evidence in the administrative record, which was well within the ALJ's discretion. *See, e.g., Hughes v. Berryhill*, 2017 WL 4854112, at *14 (S.D.W. Va. 2017), *adopted sub nom.*, 2017 WL 4849116 (S.D.W. Va. 2017) (finding a cane not medically necessary where other than prescriptions, the record contained no "medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)."); *Morgan v. Comm'r, Soc. Sec.*, 2014 WL 1764922, at *1 (D. Md. 2014) (a notation that an individual "needs cane to stand" without elaboration was insufficient to establish medical necessity with respect to the "circumstances for which it is needed.").

Here, the ALJ satisfied the basic duty of explanation when determining that Plaintiff's use of a cane is not medically necessary, and, thus, the ALJ's RFC determination does not frustrate meaningful review. The ALJ's decision to omit from the RFC any limitation involving the use of a cane is supported by substantial evidence.

**<u>Sarcoidosis</u>**

Plaintiff argues the ALJ did not properly account for sarcoidosis in the RFC.

The ALJ found sarcoidosis as a severe impairment. (Tr. 799). The ALJ considered Listings

10

dealing with the respiratory system, the cardiac system, and the immune system.[3] (Tr. 801-802). The ALJ limited Plaintiff to an RFC of light work with never climb ladders/scaffolds, occasionally climb ramps/stairs, and never exposure to temperature extremes, high humidity, concentrated pulmonary irritants, or work hazards. (Tr. 803). The ALJ summarized Plaintiff's hearing testimony about symptoms from sarcoidosis:

> At the July 16, 2015, hearing claimant testified his sarcoidosis caused fatigue, chest pain, and shortness of breath. He stated his doctors recommended placement of an implantable cardioverter defibrillator (ICD) to rescue him from sudden cardiac arrest. He reported, however, that he declined the procedure because it would not improve his shortness of breath or energy, though he stated he would consider it in the future. Claimant testified he could not walk far and that he could not consistently lift even 8 to 10 pounds because lifting caused chest pain.
>
> At the May 10, 2018 hearing, claimant testified he had pulmonary problems, which caused shortness of breath, chest pain, and fatigue. He stated he did not undergo implantation of an ICD because, while it would have stopped a heart attack, it would not have improved his lung function or breathing. He reported his providers continue to evaluate and monitor his heart.

(Tr. 804)(emphasis added). The ALJ reviewed treatment records with diagnosis of cardiac and pulmonary sarcoidosis and Plaintiff's complaints to his providers. (Tr. 804). The ALJ acknowledged there was evidence consistent with the diagnosis, but found there were no abnormal findings that supported disability and the evidence was aligned with the assigned RFC for the relevant period. (Tr. 804). Plaintiff only generally reported chest symptoms as occurring occasionally. (Tr. 805). Plaintiff did not regularly report the symptom of fatigue to his providers and made few if any reports of

---

[3] Sarcoidosis is an inflammatory disease that may affect multiple organs and cause abnormal masses consisting of inflamed tissues to form in organs. *Johnson, v. W.V. Univ. Bd. of Governors*, 2022 WL 908496, at *2 (S.D.W. Va. Mar. 28, 2022); *United States v. Moses*, 2020 WL 6275010, at *2 (W.D.N.C. Oct. 26, 2020). "When too many of these clumps form in an organ they can interfere with how that organ functions." *Thornton v. Univ. of Maryland Med. Sys.*, 2016 WL 6525633, at *2 (D. Md. Nov. 2, 2016).

palpitations or syncope. The ALJ cited to Exhibits B1F, B2F, B5F, B8F, and B15F in support. (Tr. 805).

The ALJ then separated out the evidence and discussed cardiac sarcoidosis with detailed specificity:

> Claimant was assessed with cardiac sarcoidosis after cardiac MRIs performed in August 2010 and February 2011 showed non-specific enhancement compatible with an infiltrative or inflammatory process such as sarcoidosis. (Exhibit B1F/263, 265, 308-9) Despite the MRI findings and the assessment of cardiac sarcoidosis, claimant's providers repeatedly indicated in treatment notes that cardiac involvement was questionable. (Exhibits B1F, B2F, B5F, and B8F) Moreover, in September 2014, claimant's cardiologist noted that claimant's reported increase in shortness of breath was most likely due to pulmonary sarcoidosis and less likely due to cardiac sarcoidosis. (Exhibit B8F/30) Notably, a cardiac MRI performed in March 2016 after the date last insured was negative, demonstrating no increased myocardial signal intensity, no perfusion abnormality, and no delayed hyper-enhancement. (Exhibit B15F/100, 102)

> The findings on the above referenced MRI's and the findings demonstrated on other objective cardiac testing do not reveal abnormalities which would have precluded claimant from performing light work. For example, Holter monitors worn by claimant in December 2011, July 2012, July 2013, and April 2014, revealed some abnormalities such as rare premature ventricular contractions, rare premature atrial contractions, and some episodes of tachycardia. Claimant, however, did not experience significant or malignant arrhythmias while wearing Holter monitors. (Exhibits B1F/229, 233, 262; B8F/47; B11F/2; and B15F/101)

> An April 2013 echocardiogram was essentially normal, with the exception of stage 1 diastolic dysfunction, as had been identified on a prior study in February 2010. (Exhibit B1F/135, 305- 306) An echocardiogram performed in February 2014 showed no significant changes. (Exhibit B7F/44) Though a May 2014 echocardiogram showed grade 2 diastolic dysfunction, the interpreting provider noted there were no significant changes in comparison to a July 2011 echocardiogram, which showed no diastolic dysfunction. (Exhibits B1F/305-6 and B7F/26) A May 2014 Lexiscan stress test showed no evidence of myocardial ischemia or infarction and demonstrated a left ventricular ejection fraction of 67 percent. (Exhibits B7F/4 and B8F/38) A December 2014 echocardiogram showed stage 1 left ventricular diastolic dysfunction with normal ventricular chamber sizes and systolic function and revealed no significant change in comparison to an April 2014 echocardiogram. (Exhibit B15F/101)

As reflected above, Holter monitoring, echocardiograms, and a stress test performed during the time period at issue did not demonstrate significant abnormalities. Nevertheless, given the indications of sarcoidosis on the August 2010 and February 2011 cardiac MRIs, claimant's cardiologist and pulmonologist advised him often throughout the time period at issue that he was at risk of experiencing a malignant arrhythmia causing sudden cardiac death. These specialists explained to claimant on multiple occasions that such an arrhythmia could occur, even without his being symptomatic. Therefore, claimant's cardiologist and pulmonologist repeatedly advised him to undergo placement of an ICD. Claimant, however, has consistently declined implantation of an ICD, expressing that he simply would rather continue with testing to monitor his condition, such as with Holter monitors and echocardiograms. (Exhibits B1F/140-142, 203-204, 235, 243, 265: B5F/26-30, 43; B8F/31; and B11F/2).

(Tr. 805-806)(emphasis added).

The ALJ concluded that based on the evidence regarding cardiac sarcoidosis that it did not

impose functional limitations more than the RFC given. (Tr. 806).

The ALJ then discussed in detail pulmonary sarcoidosis evidence:

A July 2011 pulmonology treatment note reports that claimant was diagnosed with pulmonary sarcoidosis after a biopsy in 2004. (Exhibit B1F/307, 309). With the exception of an apparent worsening of claimant's shortness of breath occurring in approximately March 2014, with improved respiratory findings as of June 2014, treatment records generally reveal claimant's respiratory functioning to have been rather good. Likewise, objective pulmonary tests have not regularly revealed particularly significant abnormalities. (Exhibits B1F, B2F, B5F, B8F, B9F, and B15F)

In particular, when reviewing a July 2012 pulmonary function test, claimant's pulmonologist reported there were only mild changes since September 2010 and stated claimant appeared to be doing well. (Exhibit B1F/231) Until approximately March 2014, claimant's treatment for respiratory symptoms consisted primarily of Symbicort and Albuterol nebulizer treatments as needed. Until approximately March 2014, claimant generally told his pulmonologist that he was doing well with only occasional shortness of breath. (Exhibits B1F, B5F, and B8F).

In March 2014, claimant reported increased shortness of breath and stated he could walk less than half a block. (Exhibit B5F/20-30) Claimant's pulmonologist noted that he suspected clinical deterioration, and initiated claimant on 20 milligrams of Prednisone daily. (Exhibit B8F/24) Claimant returned to his pulmonologist in April

13

2014, reporting he had not yet seen a benefit from the steroids, and his pulmonologist noted that pulmonary function testing performed at that visit showed a significant decline in function correlating to his symptoms. (Exhibit 5B8F/47) Claimant's pulmonologist continued him on 20 milligrams of Prednisone, however, and <u>June 2014 pulmonary function testing revealed significant improvement.</u> Accordingly, at claimant's June 2014 visit, <u>claimant's daily Prednisone dosage was decreased</u>. (Exhibits B7F 15 and B8F 33, 37-40)

Claimant told his pulmonologist during a February 2015 visit that he had experienced a slow decline in his exercise tolerance and that he had never felt clinically better on steroids or Lasix. (Exhibit B8F/13) Treatment records, however, document few visits with claimant's pulmonologist between June 2014 and February 2015. <u>Furthermore, pulmonary function testing performed in March 2015 demonstrated additional improvement when compared to pulmonary function testing performed in April 2014 and June 2014.</u> (Exhibit B9F/3, 12) Claimant participated in a few sessions of pulmonary rehabilitation in April 2015 and May 2015. (Exhibit B8F 19, 20) February 2016 pulmonary function test results were similar to the pulmonary function test results in March 2015. (Exhibit B15F/49) In December 2016, well after the date last insured, claimant's pulmonologist reported claimant's pulmonary function test results had been stable for the last two years. (Exhibit B15F/51)

Claimant was prescribed inhalant medications such as Albuterol, Symbicort, and Spiriva. He did not require inpatient hospitalization for respiratory symptoms, however, during the time period, nor did he require daily dosages of oral Prednisone greater than 20 milligrams for extended periods of time. <u>Beginning in November 2015, claimant's pulmonologist began reporting there was no need for steroids from a pulmonology standpoint.</u> (Exhibit B15F/102, 130) After claimant's December 31, 2015, date last insured, during a September 2017 visit, claimant's pulmonologist reported that claimant had been off Prednisone since 2016. (Exhibit B11F)

(Tr. 806-807). It is evident the ALJ fully considered Plaintiff's temporary decline in March 2014 and then improvement by June 2014. The ALJ specifically noted that in formulating the RFC of light, sarcoidosis was considered along with specific complaints of shortness of breath and chest pain, but that cardiac testing, pulmonary function tests, exams, and response to treatment did not reveal any remarkable abnormalities. The ALJ noted climbing was limited due to shortness of breath but that Plaintiff did not regularly report such difficulty. The ALJ specifically noted that pulmonary function tests were consistent with ability to occasionally climb ladders/scaffolds. (Tr. 808). As to the RFC

limit of environment, the ALJ specifically noted limits related to the impairment of sarcoidosis:

> Giving further consideration to sarcoidosis and claimant's complaints of shortness of breath, I find he could have no concentrated exposure to pulmonary irritants, though he did not regularly report problems with such exposure to his treating providers. Claimant told his pulmonologist in May 2016 that his dyspnea gets worse in hot weather (Exhibit B15F/97), though he did not regularly make such reports during the relevant period. Even so, I find it reasonable to conclude that shortness of breath associated with sarcoidosis would preclude claimant from having exposure to temperature extremes and high humidity. Moreover, out of an abundance of caution, I find claimant's severe impairments would preclude him from having exposure to work hazards.

(Tr. 809). The ALJ noted he found Plaintiff more limited than four consultants had found. (Tr. 809).

An RFC is "an administrative assessment made by the Commissioner based on all the relevant evidence in the case record." *Felton-Miller v. Astrue*, 459 Fed. Appx. 226, 230-31 (4th Cir. 2011) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)). The determination of an RFC is an administrative determination not a medical one. *See* 20 CFR § 404.1546. The ALJ explained the evaluation of the record evidence in detail as to the two diagnosis of sarcoidosis. The undersigned has reviewed the exhibits cited by the ALJ as substantial evidence. "The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court." *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996). The ALJ's RFC here properly addressed the limitations supported by substantial evidence in the record.

As to Plaintiff's arguments regarding a proper function by function analysis, the ALJ's RFC and RFC narrative is supported by substantial evidence as displayed above. (ECF No. 25 at 17). The RFC discussion by the ALJ permitted meaningful review.[4]

---

[4] Remand may be appropriate when there is no function by function analysis, but remand is only appropriate when meaningful review is frustrated and the court is "unable to fathom the rationale in relation to evidence in the record." *See Mascio*, 780 F.3d at 636 (*citing Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)). Such is not the case here on either account. *See e.g.*

**VA Opinion**

Plaintiff argues the ALJ erred in weighing the VA opinion.[5]

In 2012, the Fourth Circuit decided *Bird v. Comm'r of S.S.A.*, 699 F.3d 337 (4th Cir. 2012). The ALJ "must give substantial weight to a VA disability rating." *Id.* at 343. The VA and the SSA "serve the same governmental purpose of providing benefits to persons unable to work because of a serious disability." *Id.* The Fourth Circuit held that because both agencies assess a person's ability to work in the national economy by focusing on functional limitations, "a disability rating by one of the two agencies is highly relevant to the disability determination of the other agency." *Id.* The ALJ may give less than substantial weight to the VA determination "when the record before the ALJ clearly demonstrates such a deviation is appropriate." *Id.*

The ALJ here found:

> VA records report claimant to have an 80% service-connected disability rating, with a 30% rating for each foot secondary to cold injury residuals; a 20% rating in each lower extremity for peripheral neuropathy/paralysis of the sciatic nerve; and a 10% disability rating for tinnitus. (Exhibits B25E, B11F/3, and B14F/3) In considering these total and individual VA ratings, I have considered *Bird v. Comm'r*, 699 F.3d 337, 343 (4th Cir. 2012). In that decision, the Court held that "...in making a disability determination, the SSA must give substantial weight to a VA disability rating. However, because the SSA employs its own standards for evaluating a claimant's alleged disability, and because the effective date of coverage for a claimant's disability under the two programs likely will vary, an ALJ may give less weight to a VA disability rating when the record before the ALJ clearly demonstrates

---

*Ladda v. Berryhill*, 749 Fed. Appx. 166, 173 (4th Cir. Oct. 18, 2018); *Wilbanks v. Berryhill*, No. CV 1:17-1069-JMC-SVH, 2018 WL 4941121, at *10 (D.S.C. Feb. 7, 2018), *report and recommendation adopted sub nom.*, 2018 WL 4476118 (D.S.C. Sept. 19, 2018).

[5] The revision to 20 C.F.R. § 404.1504 for applications after March 27, 2017 states the SSA is not obligated to provide any analysis about a decision made by any other governmental agency or nongovernmental entity but will consider supporting evidence underlying that agency's decision. Plaintiff's application was filed before this regulatory change and the change is inapplicable here.

16

that such a deviation is appropriate."

In considering claimant's disability rating in light of *Bird*, I find the record here clearly demonstrates it is appropriate to give the VA disability total and individual ratings little weight. In assessing the weight to give to a VA disability rating, it is imperative to review and assess the evidence of record from the VA's own treatment notes. In fact, during the relevant time period, claimant received nearly all of his medical treatment from VA facilities. As explained in paragraph 3 of this decision, such treatment records do not support a conclusion that claimant's history of frostbite injury to the feet with osteoarthritis of the feet, imposed more than minimal functional limitations during the time period at issue. There are no x-rays or electromyogram and nerve conduction studies of claimant's lower extremities from the time period at issue which demonstrate abnormalities. As previously discussed, claimant's podiatrist did not document particularly significant clinical findings; treatment records from the relevant time period do not regularly document significantly reduced lower extremity strength or sensation; and the evidence does not support the medical necessity of claimant's use of a cane. (Exhibits B1F, B5F, B8F, B9F, and B15F)

I further note with regard to the VA ratings that the record reflects claimant sustained his frostbite injuries in 1984 or 1985 but that he worked for several years thereafter as an electrician. In addition, the lack of significantly abnormal objective and clinical findings in evidence does not support a conclusion that claimant's osteoarthritis or history of frostbite of the feet have been progressively worsening conditions, or that they impose functional limitations in excess of those included in this decision. In assigning little weight to the VA ratings, I have considered claimant's evaluation for lower extremity neuropathy in December 2015, and while the clinical examination and subsequent NCS do not reveal particularly remarkable findings, lower extremity neuropathy is accounted for in claimant's assigned residual functional capacity. Finally, with regard to the VA rating noting paralysis of the sciatic nerves, evidence prior to the date last insured does not document clinical or objective findings suggestive of sciatic nerve paralysis, nor did claimant regularly complain of tinnitus during the relevant period.

(Tr. 810-811).

As demonstrated above, the ALJ here gave several reasons and explanation as to why a deviation from substantial weight was warranted citing contemporaneous treatment notes, exams, and tests from the VA itself. The ALJ here did not perform a cursory review. Upon review of the ALJ's decision in tandem with Plaintiff's medical records, it appears the ALJ provided sufficient

17

justification for the deviation from the VA's rating and affording it little weight based on the record before the ALJ. *Bird*, 699 F.3d 337, 343.  The ALJ gave specific reasons for giving the VA rating less than substantial weight, which were supported by the record.

**Subjective Symptom Evaluation**

Plaintiff argues the ALJ erred in the subjective symptom evaluation.[6]

SSR 16-3p is applicable to cases decided after its effective date, such as this case.  *See Morton v. Berryhill*, No. 8:16-cv-0232-MBS, 2017 WL 1044847, *3 (D.S.C. Mar. 20, 2017). Although SSR16-3p eliminates usage of the term "credibility" because the regulations do not use the term, the assessment and evaluation of Plaintiff's symptoms requires usage of most of the same factors considered under SSR 96-7p.

Under *Craig v. Chater*, 76 F.3d 585, 591-96 (4th Cir. 1996), subjective complaints are evaluated in two steps.  First, there must be documentation by objective medical evidence of the presence of an underlying impairment that would reasonably be expected to cause the subjective complaints of the severity and persistence alleged.  Not until such underlying impairment is deemed established does the fact-finder proceed to the second step: consideration of the entire record, including objective and subjective evidence, to evaluate the intensity and persistence of symptoms to determine how symptoms limit capacity for work.  *See also* 20 C.F.R. § 404.1529; SSR16-3p, *4.

The ALJ may choose to reject a claimant's testimony regarding his condition, but the ALJ must explain the basis for such rejection to ensure that the decision is sufficiently supported by substantial evidence.  *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir.

---

[6] There are a number of references by Plaintiff in this argument section of the brief as to "credible/credibility."  SSR 16-3p eliminated use of this term.

1989) (quoting *Smith v. Schweiker*, 719 F.2d 723, 725 n.2 (4th Cir. 1984)). A claimant's allegations "need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers[.]" *Craig*, 76 F.3d at 595. The ALJ considers the evidence in the record as a whole when analyzing Plaintiff's claims, as does this court when reviewing the ALJ's decision. *See id.*; *see* SSR 16-3p, at *4.

A claimant's statements about intensity, persistence, and limiting effects of symptoms, which are inconsistent with the objective medical evidence and other evidence, are less likely to reduce her capacity to perform work related activities. SSR 16-3p, at *7; 20 C.F.R. § 404.1529(c). An individual's symptoms are evaluated based on consideration of objective medical evidence, an individual's statements directly to the Administration, or to medical sources or other sources, and the following factors:

> 1. Daily activities;
> 2. The location, duration, frequency, and intensity of pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
> 7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p, at *7; 20 C.F.R. § 404.1529(c). The ALJ at step three is to "consider the individual's symptoms when determining his or her residual functional capacity and the extent to which the individual's impairment-related symptoms are consistent with the evidence in the record." SSR

16-3p, at *11.

Plaintiff argues *Arakas v. Comm'r*, 983 F.3d 83 (4th Cir. 2020) held that it is error to reject subjective allegations that are inconsistent with objective evidence. (ECF No. 25 at 32). However, *Arakas* focused on the standard for evaluating fibromyalgia(FM), an impairment that tends to elude objective evidence and a presentation of which is almost entirely subjective. This case does not present an issue about an elusive disease with no objective medical evidence. *See Hayes v. Comm'r*, No. 2:20-CV-03033-BHH-MGB, 2022 WL 1057179, *11 (D.S.C. Jan. 27, 2022). Plaintiff argues the ALJ downplayed or ignored most of the evidence and that this makes the findings "simply unreviewable" by the court. (ECF No. 25 at 33). A review of the ALJ's decision shows an in-depth consideration of evidence with citation to and consideration of both abnormal and normal findings and citation to and consideration of Plaintiff's subjective complaints.

The ALJ found Plaintiff's statements concerning the intensity, persistence and limiting effects of his alleged symptoms were not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in the decision. (Tr. 804). Before this statement, the ALJ reviewed Plaintiff's testimony:

> At the July 16, 2015, hearing claimant testified his sarcoidosis caused fatigue, chest pain, and shortness of breath. He stated his doctors recommended placement of an implantable cardioverter defibrillator (ICD) to rescue him from sudden cardiac arrest. He reported, however, that he declined the procedure because it would not improve his shortness of breath or energy, though he stated he would consider it in the future. Claimant testified he could not walk far and that he could not consistently lift even 8 to 10 pounds because lifting caused chest pain.
>
> At the May 10, 2018 hearing, claimant testified he had pulmonary problems, which caused shortness of breath, chest pain, and fatigue. He stated he did not undergo implantation of an ICD because, while it would have stopped a heart attack, it would not have improved his lung function or breathing. He reported his providers continue to evaluate and monitor his heart.

20

At the February 10, 2020 hearing, claimant testified he lives alone in a mobile home. He said his entire work history consisted of working as an electrician, and that he stopped working due to a physical inability to complete the tasks required of his job. He reported having had difficulty breathing and daily chest pain. He stated he had difficulty walking, lifting, kneeling, and climbing. Claimant testified he received medical treatment primarily from the VA, with pulmonology visits every 3 months and primary care visits every 6 months. He reported he used inhalers for breathing issues and was prescribed Gabapentin for nerve pain. He said his medications caused side-effects such as headaches and nausea. Claimant testified that as of the date last insured, he could sit for only 20 to 30 minutes at a time and stand and/or walk for only 10 to 15 minutes at a time. He said he could not lift more than 10 pounds secondary to cardiac stress. He reported chest pain caused him to have decreased ability to grasp with his right hand. Claimant testified he was able to perform personal needs tasks but relied upon family, who live next door, to perform his household chores. He reported that he spent his time alone or with his family and/or girlfriend. He said he had no treatment for any psychological issues before the date last insured.

(Tr. 804). The ALJ then reviewed treatment of Plaintiff's sarcoidosis, as already discussed above. (Tr. 804-807). The ALJ reviewed treatment notes regarding neuropathy and complaints of numbness, tingling, and weakness in the lower extremities. (Tr. 807). The ALJ noted mostly normal exams except for 4/5 strength to ankle dorsiflexion, inversion, eversion, and toe extension. Plaintiff had normal sensation and reflexes. A NCS was normal. (Tr. 807). The ALJ noted etiology of neuropathy was unclear but that the ALJ found it as severe and accounted for it in the RFC. (Tr. 808). The ALJ stated: "I also have considered the strength and sensory findings relating to claimant's complaints of lower extremity symptoms. These findings also are consistent with the ability to climb ramps and stairs occasionally despite claimant's lower extremity complaints." (Tr. 808). The ALJ specifically considered complaints of shortness of breath, chest pain, and numbness, tingling, and weakness in the lower extremities in formulating the RFC. (Tr. 808-809). Then, the ALJ individually addressed Plaintiff's testimony about medication side effects; Plaintiff did not regularly report side effects to his treating providers. (Tr. 809). The ALJ noted brief elevated labs related to statin medication that

21

after adjustment did not impose limitations above the RFC. (Tr. 809).  The ALJ specifically addressed Plaintiff's complaints about kneeling and grasping:

> Regarding claimant's testimony that he has difficulty kneeling, he did not regularly report this to his treating providers during the relevant period, nor do treatment records regularly document abnormal range of motion findings which would limit his ability to kneel. With respect to claimant's testimony that chest pain caused him to have decreased ability to grasp with his right hand, treatment records prior to the date last insured do not regularly document reduced grip strength. Moreover, the extensive diagnostic cardiac testing performed during the relevant period, discussed above in this decision, does not offer any physiologic explanation for claimant's alleged decreased grasping ability.

(Tr. 809). The ALJ factored Plaintiff's complaints that were supported by substantial evidence into the RFC determination. To the extent Plaintiff argues briefly that the ALJ relied on activities without considering the extent of activities, the ALJ addressed activities only in the context of social interaction in the Listings analysis. (ECF No. 25 at 25);(Tr. 802). In the subjective symptom evaluation and the RFC narrative, it appears the ALJ did not rely on activities of daily living to show any inconsistency in the evidence of record.

The standard of review here is not whether conflicting evidence might have resulted in a contrary decision, but it is whether substantial evidence supports the ALJ's decision.  Even with some evidence of abnormal findings, the ALJ provided more than a mere scintilla of record support for the subjective symptom evaluation. The court does not weigh again evidence already weighed by the ALJ.  The ALJ complied with the applicable regulations in making clear to a subsequent reviewer the reasons for the findings made. The ALJ's decision was based on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted).

### III. CONCLUSION

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence. *Richardson*, 402 U.S. at 390. Even where the Plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock*, 483 F.2d at 775. The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). As previously discussed, despite the Plaintiff's claims, he has failed to show that the Commissioner's decision was not based on substantial evidence. Based upon the foregoing, and pursuant to the power of the Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in social security actions under sentence four of Sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. Sections 405(g) and 1338(c)(3), the Commissioner's decision is AFFIRMED.

<u>s/ Thomas E. Rogers, III</u>
August 17, 2022                                             Thomas E. Rogers, III
Florence, South Carolina                            United States Magistrate Judge